## Bickford and Huffman *vs.* Biddlecum.

The plaintiffs, being first indorsers, in their firm or partnership name, upon certain drafts drawn, and bank notes made, by B. and the defendant second indorser only, on a small portion thereof, and a bank note on which he was first indorser, they entered into a written agreement with B.—the plaintiffs in their firm name, and the defendant individually—by which they, in consideration of certain property assigned by B. jointly agreed " to pay and assume all drafts by us indorsed for the accommodation of said B. drawn by him on S. G. & Co. amounting to $4500, and the bank paper indorsed by us $936." The agreement then provided that in case more should be realized, out of the property so assigned, " than enough to pay our said liabilities over said sum of $3693, and all costs, expenses and legal charges, we agree to pay over to said B. or his assigns, all such surplus or excess after payment of our said liabilities, &c. over the said sum of $3693 as aforesaid."

*Held.*1. That by this agreement neither of the assignees and promissors intended or expected to incur any liability, beyond what they had already incurred, contingently, by their indorsement. That to hold that the defendant, by virtue of such agreement, became jointly liable with the plaintiffs to pay the debts of B. for which he was not before in any respect liable, would be to wrest it from its plain terms and obvious meaning. ·

2. That there was nothing in the surrounding circumstances which showed, or tended to show, that the defendant meant to bind himself, to any extent, beyond his then existing liabilities.

3. That although the defendant supposed, at the time, that he was upon all the paper, as second indorser, the amount of which was specified, this mistaken belief or supposition would not operate to enlarge the contract beyond its plain limitation in terms, viz. paper " indorsed by us."

4. That the legal effect of the joint undertaking by the plaintiffs and the defendant, upon the receipt of the assigned property, was, to change the nature and character of their obligation, as accommodation indorsers of B. into that of principal debtors, with B. as their surety, in respect to all the paper on which their names appeared.

5. That the agreement could not be so construed as to interpolate a covenant that the parties would pay and assume all drafts and other bank paper indorsed by them, *or either of them;* the effect of which would be to change the contract which the parties made.

APPEAL from a judgment entered upon the report of a referee. The complaint claimed equitable relief, and sought an accounting, and a construction of a certain paper given by the plaintiffs and defendant to one Bancroft, for whom the parties had acted as sureties and in-

dorsers. The cause was referred to Hon. Addison Gardner, to hear and decide.

The parties reside at Macedon, Wayne county. Previous to the 22d of January, 1861, the plaintiffs as a firm, and the defendant, had, from time to time, indorsed paper for Luther Bancroft, then residing in said town, for his accommodation. On that day, Cuyler's Bank at Palmyra, held five several drafts drawn by Bancroft on Stebbins, Gray & Co. of New York, payable severally at ninety days, to the order of the plaintiffs, by their firm name, of Bickford & Huffman, for $1000 each, the first dated October 26, 1860, the second dated October 31, 1860, the third November 2, 1860; the fourth November 8, 1860, the fifth November 14, 1860, each was indorsed by the plaintiffs by their firm name, and accepted by Stebbins Gray & Co.; the second was also indorsed by the defendant; and the fifth was indorsed by John F. Packard; all for Bancroft's accommodation, and all of said drafts had been duly transferred to Cuyler's Bank. On the same day, Cuyler's Bank held three notes made by Bancroft, indorsed by the plaintiffs as a firm, and the defendant, for Bancroft's accommodation, on one of which the defendant was first indorser, on the others the plaintiffs were first indorsers, on which was due about $826.60. On the 21st of January, 1861, Bancroft spoke to the defendant in reference to the former securing his indorsers, stating that farmers were pressing him; and thereupon the defendant had a conversation with the plaintiffs about it, which led to the parties going to Rochester, as hereinafter mentioned. Stebbins, Gray & Co. and Bancroft, had then failed in business, and become, and have since remained insolvent; and the former had made a general assignment in trust for creditors. On the 22d of January, 1861, the parties met at the city of Rochester; they did not know the amount of the drafts and notes; the defend-

Bickford *v.* Biddlecum.

ant and Bancroft supposed and believed the former had indorsed all of said drafts; and the plaintiffs believed the defendant had indorsed all of said drafts and notes, except the draft indorsed by Packard upon which they knew the defendant was not an indorser, but did not communicate the fact to the defendant or Bancroft. All the parties then supposed the drafts and notes were held by Cuyler's Bank, which was the case, but the drafts had in fact been sent forward to New York for collection; the parties did not know the amount of said notes and drafts. Bancroft estimated the amount of the drafts at $4500, stating that $500 would be paid thereon; and under these circumstances, at Rochester, the following agreement was executed and delivered to Bancroft, viz:

" In consideration of real estate to us, Bickford & Huffman, as a firm, and to Joab S. Biddlecum, conveyed by Luther Bancroft and wife, amounting over incumbrances, to the
sum of . . . . . . . . . . . . . . $2,377 50
And personal property . . . . . . . . . . 1,315 50

In the aggregate . . . . . . . . . $3,693 00

And also his transfer to us of all his claim and rights under the assignment of Stebbins, Gray & Co. of the city of New York, we do agree to pay and assume all drafts by us indorsed for the accommodation of said Bancroft, drawn by him on said Stebbins, Gray & Co. amounting
to . . . . . . . . . . . . . . . . $4,500 00
And other bank paper thus indorsed by us . . 936 00

In all . . . . . . . . . . . . . . $5,436 00

And if we realize out of said assignment more than enough to pay our said liabilities over said sum of $3693, and all costs, expenses, and legal charges, we agree to pay over to said Bancroft or his assigns all such surplus or

excess after payment of our said liabilities, and all costs, expenses and legal charges over the said sum of $3693 as aforesaid. January 22, 1861.

(Signed)      BICKFORD & HUFFMAN,

JOAB S. BIDDLECUM."

Possession of the property and effects mentioned in the agreement was delivered by Bancroft to the plaintiffs as a firm, and the defendant. On the 25th of January, 1861, the plaintiffs, as a firm, and the defendant, made and delivered to the said bank their note for $826.60, for the amount due on the three notes in said bank aforesaid. In the making of said agreement, it was talked between the parties and believed by them that the property and effects transferred would pay said indebtedness, and that there would be a surplus of some $2000 for Bancroft under the agreement. On the second day after the making of the agreement, the defendant and the plaintiff Huffman, went to Cuyler's bank, and on their return the defendant stated to Bickford there was $1000 more than Bancroft had given in, and they ought to have his books and accounts; and proposed to hire $4000, and pay the bank, and get time to dispose of the property. It was proved by a witness, under objection by the plaintiffs, that in the spring of 1865, the defendant stated to him the circumstances under which the agreement of January 22, 1861, was made, and said the plaintiff and himself had been indorsing paper for Bancroft, who was indebted to farmers for produce, and they were urging him strongly for payment; that to save litigation and protect themselves they made the agreement; that the necessity for action was so urgent they could not ascertain the amount for which they were indorsers, or for which either was indorser, and entered into the agreement the same as if they had known they were mutually liable; that they thought there would be enough of Stebbins, Gray & Co.'s property to cover all

the indebtedness and liabilities. The property and effects, including $1000 realized from Stebbins, Gray & Co.'s assignment, proved insufficient to pay the indebtedness referred to in the agreement. The plaintiffs have paid upon said indebtedness, other than the drafts upon which the defendant was indorser, about $2000, over and above the avails of the property and effects, and taken up said drafts and bank paper. There is no probability any thing further will be realized from the assignment of Stebbins, Gray & Co.

In the winter of 1861, or spring of 1862, the defendant ascertained that he was not an indorser or liable on but one of said drafts, and so informed the plaintiff, and then, and ever since has, insisted that he was not bound to pay any paper of Bancroft upon which the defendant's name did not appear as indorser; and thereupon offered to give up to the plaintiffs all the property and effects transferred by Bancroft, *on being saved harmless by them from all papers signed or indorsed by him.* The plaintiffs have at all times insisted the defendant was bound by the agreement of January 22, 1861, to pay said drafts and bank paper to the extent of one half thereof, irrespective of who had indorsed the same, or any undertaking or liability previous to said agreement.

The referee found, as conclusions of law, from the above facts:

*First.* That by the terms of said agreement the joint obligation upon the part of the plaintiffs and the defendant to assume and pay all drafts and other bank paper indorsed by them is limited to paper upon which the names of the plaintiffs, as a firm, and the defendant appear as indorsers.

*Second.* That as the plaintiffs sustained to the defendant the relation of first indorsers, upon paper on which the names of both appear as indorsers, and as to the residue they were exclusively liable, the joint obligation out of which the equitable right to contribution must arise ought

not to be extended by construction to the prejudice of the defendant.

*Third.* That as the defendant offered to give the plaintiffs the benefit of all the papers received from the principal debtor upon the condition above named, before the commencement of this suit, to pay over to them, without any conditions, the balance in his hands, he was entitled to deduct the costs of his defense from said balance, and to account to the plaintiffs for what (if any thing) might remain after such deduction.

Judgment being entered accordingly, the plaintiffs appealed.

*T. R. Strong,* for the appellants. I. The agreement, in writing, of the 22d of January, 1861, created a joint and equal obligation of the plaintiffs, as a firm, and the defendant, to pay the drafts and bank paper referred to in the agreement. It was made a substitute for their former agreements and relations connected with the drafts and bank paper, which former agreements and relations were, by this agreement, satisfied and terminated. *Westfall* v. *Parsons* (16 *Barb.* 645) is directly in point to this proposition. (*Coburn* v. *Wheelock,* 42 *Barb.* 267.) The opinion of the referee, in respect to this point, is to the same effect. 1. The terms of the agreement, either alone or connected with the oral evidence, import a joint obligation of the plaintiffs, as a firm, and the defendant, to assume and pay the drafts and bank paper, for a substantial consideration paid them by Bancroft. They jointly received the consideration, and jointly undertook to pay the drafts and bank paper. 2. It is an important fact, in relation to this part of the case, that there was a substantial consideration paid by Bancroft for the obligations they assumed by the agreement, and that they received it jointly. 3. Another still more important fact, to the same point, is, that at the date of the agreement of January 22, 1861, the liabilities

Bickford *v.* Biddlecum.

of either the plaintiffs' firm, or the defendant, as indorsers, had not become absolute and fixed; none of the drafts had matured, and neither party had been charged as indorser on either draft. 4. Another important fact, to the same point, is, that all parties regarded it as certain that the drafts and bank paper would all be paid by the provision for it made by the agreement, and that there would be a surplus of some $2000 to return to Bancroft. 5. The plaintiffs, as a firm, and the defendant were willing, as to Bancroft and as between themselves, in view of the consideration to them jointly, and the other circumstances, to assume a joint and equal obligation. 6. The plaintiffs would never have consented to the defendant having an equal interest with them in the property, if he had not assumed an equal obligation. It is unreasonable to suppose such an advantage to him was intended. 7. Upon the construction of the agreement insisted on by the defendant, it is difficult to see why the defendant might not retain one half of the property conveyed and transferred to the firm and the defendant, to the value of $3693, although under no liability as between him and the plaintiffs' firm, except as subsequent indorser to the plaintiffs' firm on one of the drafts, and under no liability to Bancroft, under the agreement, except as to that one draft. 8. It was the manifest intention of all the parties in fact, as well as the legal construction and effect of the transaction, that the agreement of January 22, 1861, should take the place of their former relations, connected with the drafts and bank paper, and supersede those former relations. The transaction was, in substance, the same as if the plaintiffs' firm and the defendant had, upon a consideration paid by Bancroft to them jointly, and before they were charged as indorsers, given their joint obligation to the creditor for the debt—assuming the payment of the debt. Indeed, that was the transaction, in form and fact. They have, for a consideration paid by

Bancroft, undertaken to pay the debt by an agreement, which the creditors were entitled to the benefit of, and to enforce, precisely the same as Bancroft himself. (*Lawrence* v. *Fox*, 20 *N. Y. Rep.* 268. *Burr* v. *Beers*, 24 *id.* 178. *Auburn City Bank* v. *Leonard*, 40 *Barb.* 119.) Another view leads to the same result. Upon the making of the agreement, on the consideration paid by Bancroft, he became, as to the plaintiffs' firm and the defendant, merely a surety for the payment of the drafts and bank paper, and they became the principals ; and the creditors were entitled to the same remedies against them which Bancroft had secured by the agreement. Upon either paying, he was subrogated to the right of Bancroft and the creditors against both, so far as to compel contribution. 9. The evidence given by Gallup is conclusive as to the parties having, in fact, intended in making the agreement what is claimed by the plaintiffs to be its just construction.

II. Bancroft having secured, for a consideration paid by him to the plaintiffs' firm and the defendant, their joint obligation to pay the debts, the obligation of Bancroft on the drafts and bank paper to them, was at an end. The relation of makers and indorsers, as between them and Bancroft, was at an end. The rights and obligations as between those parties, and between the plaintiffs' firm and the defendant, in respect to the drafts and bank paper, were thenceforth governed wholly by the new agreement, which took the place of the former agreement arising wholly from the accommodation indorsements. For some time after the making of the agreement in question, the acts of all the parties were in accordance with the construction contended for by the plaintiffs ; then the defendant began to disclaim liability ; and ever since the claims of the respective parties have been in conflict.

III. The agreement of the 22d of January, 1861, embraced all of the five drafts and all the bank paper aforesaid. This is clearly apparent from the following con-

Bickford *v.* Biddlecum.

siderations : 1. The language of the agreement might well have been used to designate all the drafts and bank paper. It would be perfectly proper to say that A and B were indorsers of a person's paper, although they were such respectively, and not jointly, or both were the indorsers of part, the name of each being on the same paper, one only the indorser of another part, and the other only the indorser of the residue; so the language here, "indorsed by us," in popular signification, might import indorsements by the plaintiffs and defendant, each and both on one of the drafts, by the plaintiffs and another person on another of the drafts, and by the plaintiffs alone on the remaining drafts. That interpretation should be given to the agreement, which appears by surrounding circumstances, in connection with the terms used, to have been intended by the parties. In *Petit* v. *Sheppard*, (32 *N. Y. Rep.* 97,) a question arose as to what land was embraced in a deed, describing the premises as being the "west part of lot No. 76," &c. On the trial the grantee gave testimony to the effect that when he purchased, his grantor went with him to the premises and pointed out the boundaries, and explained to him that the west part of the lot extended to a particular line, and other similar testimony. The Court of Appeals say the testimony was "material and important as to the intention of the grantor, and the identity of the premises." The evidence was not given to vary or contradict the deed, but to identify the subject matter, and to "show what the grantor intended," &c. The court say, "the evidence having been admitted, the question necessarily arose, and was properly submitted to the jury," as to what the deed conveyed. "That was a question of fact, arising upon the evidence." (*See Huffman* v. *Ætna Fire Ins. Co.*, 32 *N. Y. Rep.* 405 ; *Dodge* v. *Gardiner*, 31 *id.* 239 ; *Martin* v. *Cope*, 28 *id.* 180.) The court may resort to extrinsic circumstances surrounding the parties at the time of the

contract, so as to place itself in the situation of the parties whose language it is about to construe. (*Hasbrook* v. *Paddock*, 1 *Barb*. 635. *Decker* v. *Furniss*, 14 *N. Y. Rep*. 611, 619, 622. *Blossom* v. *Griffin*, 13 *id*. 569. *Liddle* v. *Market Fire Ins. Co.*, 4 *Bosw*. 179.) 2. The agreement gives as the amount of the drafts $4500, and of bank paper, $936; the drafts outstanding, indorsed by the firm, amounted to $5000, one of which, only, the amount thereof being $1000, was indorsed by the defendant; the other bank paper, indorsed by the firm and the defendant, amounted to $826.60, the amount of the note given by the firm and the defendant therefor three days afterwards. The reason for specifying, in the agreement, the amount of the drafts at $4500 was, that it was talked that $500 would be paid on the drafts from another source, which would reduce the amount to $4500. 3. Applying the agreement only to the one draft indorsed both by the firm and the defendant, and the bank paper also indorsed by the defendant as well as the firm, in all $1826.60, one effect would be that the firm and the defendant would retain and share between themselves, jointly, the $3693 consideration actually paid to them for assuming to pay $1826.60; of this the firm would have to pay half, thus leaving to the defendant a profit of $925. Another effect would be, that any surplus realized by said firm and the defendant out of the assignment of Stebbins, Gray & Co., "more than enough to pay our said liabilities over said sum of $3693, and all costs, expenses and legal charges," would have to be paid over to Bancroft, without applying one dollar to the $4000 of drafts indorsed by the firm alone. The $4000 of drafts indorsed by the plaintiffs as a firm, and not by the defendant, would be wholly unprovided for as to Bancroft, or as to the firm, otherwise than that the firm would receive a like bonus as the defendant, of $925, which they might apply, or not, at their pleasure. It is wholly unreasonable to suppose that Bancroft, or the plaintiffs, intended

any such thing, or would consent to so absurd and unjust an arrangement. 4. Bancroft had failed by reason of the failure of Stebbins, Gray & Co. The firm and the defendant were desirous that their liabilities should be provided for. In order thereto, the consent of Bancroft was necessary. The wishes of either, exclusively, could not prevail, and the mode of security adopted, was agreed upon. It would be a most unnatural and extraordinary view, to regard the arrangement as intended to be restricted, in any event, to one of the drafts only, and the other bank paper, with such consequences as before mentioned. Bancroft manifestly intended to provide for all his liabilities, and to impose on the firm and the defendant a joint obligation as to all; and this was well understood by the plaintiffs and the defendant. The night before the agreement, Bancroft spoke of securing his indorsers. All parties then supposed the provision to be ample, and contemplated a surplus to be returned to Bancroft, which they provided for. In view of the ample provision, and in order to obtain it, the firm and the defendant were willing to incur the joint liability, as Bancroft's terms required. They were bound to accept the terms, in order to get the property. 5. All the parties, Bancroft, the plaintiffs and the defendant, at the making of the agreement, understood, as was the fact, that all the drafts and bank paper were held by Cuyler's Bank; and also understood that all the drafts and the bank paper were the subject of the agreement. All supposed the plaintiffs and defendant were on all the paper; except the plaintiffs knew the defendant was not on the draft indorsed by Packard; but it does not appear the plaintiffs knew, were informed, or suspected that either Bancroft or the defendant did not understand that fact. 6. The action of the parties was in accordance with this view for a long period after the making of the agreement. After having ascertained the amount of the drafts and bank paper, by calling

at the bank, the day after the agreement, the defendant proposed to hire $4000, and pay the bank, to get time to dispose of the property. Nothing could show more plainly than the foregoing considerations, that the agreement was, in fact, made with reference to, and to include and provide for, all the paper. 7. The testimony of Gallup is decisive that such was, in fact, the intention of the parties.

IV. There is nothing in the case to warrant the restricting the agreement in operation to one draft and the bank paper, when it was manifestly intended by the parties to embrace in it all the drafts and the bank paper. .1. No fraud or mistake is alleged in the answer, and hence no evidence to the point would be received or regarded. (*Brazill* v. *Isham,* 12 *N. Y. Rep.* 17. *Wright* v. *Delafield,* 25 *id.* 270.) 2. None is proved. Bancroft, as well as the defendant, believed the defendant was on all the drafts, and the plaintiffs so believed, except as to the draft indorsed by Packard; and they did not know but Bancroft and the defendant understood the defendant was not on that draft as well as they did. No fraud or mistake is found. The testimony of Gallup would disprove any pretense of fraud, if such a pretense should be suggested. 3. But if there had been a mistake, the defendant could not hold on to the benefits of the contract, and at the same time repudiate its obligations. If he desired to rescind and could do so, he should promptly have relinquished the property, and given Bancroft and the plaintiffs an opportunity to make a disposition of it according to what the plaintiffs claim was intended. No offer was made by him at any time to give up the property, except to the plaintiffs, on his liabilities being paid in full. He did not propose to relinquish it to Bancroft or the plaintiffs, and allow a new arrangement to be made; but insisted on holding on so far as was necessary for his security.

V. The referee by his first conclusion of law, limits the application of the agreement to the one draft, and the other bank paper " upon which the names of the plaintiffs, as a firm, and the defendant appear as indorsers," because, as appears from his opinions, he construes the words of the agreement, " to pay and assume the drafts indorsed by us," &c. and " other bank paper thus indorsed by us " as imposing that limitation. 2. In this construction he disregards the plain fact, appearing from his findings of fact, that the agreement was made with reference and intended to apply to all the drafts and bank paper, all the parties, Bancroft, the plaintiffs, and the defendant, understanding all the drafts and bank paper were so indorsed, except as to the plaintiffs as aforesaid, in reference to the draft indorsed by Packard, appearing also aside from the findings, by the sums stated in the agreement as the amounts of the drafts and bank paper, being the true amount of all the drafts, after a payment it was then understood was to be made thereon, and about, a trifle in excess, the amount due on the bank paper; appearing also by the testimony of Gallup, which the referee admitted, thus preventing an exception, and therefore was bound to allow it due weight; appearing also by the absurdity of supposing that Bancroft and the other parties intended the plaintiffs might retain the property conveyed to them, valued at $3693, for agreeing in consideration thereof, and the transfer of Bancroft's claim under Stebbins, Gray & Co.'s assignment to pay one of the drafts and bank paper, amounting to less than $2000, providing for the payment to Bancroft of any surplus from the assignment after payment of the said one draft and bank paper, making no provision for the other drafts of $4000; and further appearing by the other considerations stated under the former points. The remark of the referee that the agreement upon his construction is consistent and sensible, it is submitted, for the reasons aforesaid, is a

mistaken one. It is also submitted that the speculations in the opinion, as to what the parties might have supposed when making the agreement in reference to the amount of their liabilities, and as to what was "very natural," and as to the probability "that either the plaintiffs or the defendant would volunteer to pay debts in which they had no concern," &c. are entirely out of place, in view of the findings and the evidence as to what the parties actually understood and intended to do and did. The language "indorsed by us," is equally equivocal in both the cases stated in the second opinion of the referee; and the positions taken in that opinion as to the plaintiffs and defendant intending to limit their obligation thereby to papers upon which both the firm and the defendant were indorsers, is overcome by the findings, and the clear evidence that the subject of the agreement and what it was intended to apply to, was all the drafts and bank paper. The principal leading purpose of the agreement was to provide for the drafts and bank paper at Cuyler's bank. For that purpose Bancroft conveyed his property, and the plaintiffs and the defendant regarded the provision ample, hence were willing to assume the payment of said drafts and bank paper. They supposed they had indorsed all of it, and hence in describing the subject, the words "indorsed by us," are used. But whether each had indorsed all or not, did not affect the general controlling purpose, or willingness to assume the obligation for the consideration offered; the words "indorsed by us," were not intended as a limitation further than words of description are such, which may always be controlled by oral evidence as to the subject.

VI. The learned referee, in construing the agreement, appears to have entirely overlooked the relations and interests of Bancroft in respect to the transaction. Of course, the construction as to the application of the agreement, its subject matter, must be the same as between

Bancroft and the plaintiffs, as a firm, and the defendant, as it is between the plaintiff as a firm and the defendant. Now suppose the plaintiff, at any time after the making of the agreement, had sued Bancroft on any of the four drafts of $4000, not indorsed by the defendant. Would, or not, the agreement have been available to Bancroft as a defense to the action? If it applied to those four drafts, it would most certainly have constituted a good defense; if otherwise, not. According to the decision of the referee, Bancroft has been at all times, and still is, liable on the four $1000 drafts, notwithstanding, and unaffected by the agreement. Was it the intention of Bancroft that in any event, whatever might appear, the agreement should not apply to those four drafts? Certainly not. This, it is submitted, amounts to demonstration that all the drafts and bank paper were the subject of the agreement. As further evidence that the rights of Bancroft have been overlooked, the second conclusion of law may be referred to. What has that doctrine to do with the case as between Bancroft and the other parties, upon the question of the application or subject matter of the agreement? And the application and subject matter are the same, necessarily so, as to all the parties.

VII. The referee has in the decision of this case, erroneously construed the agreement in question more rigorously as to the plaintiffs, and Bancroft, and more liberally to the defendant than would have been allowable in any period of the law; and thereby has unintentionally done the plaintiffs injustice; hence the judgment should be reversed, and a new trial granted, with costs, &c.

*E. G. Lapham,* for the respondent. I. The exceptions, though four in number, really present but two questions for consideration. 1st. What is the true construction and legal effect of the writing given by the parties to Bancroft?

and, 2d. Was the referee justified in allowing costs to the defendant?

*First.* The question arising upon the merits is so fully met and discussed by the referee, in his opinion, as to preclude the necessity of farther amplification. The case in 42 *Barb.* 267, relied on by the plaintiffs' counsel, on the trial, has no application to the facts of this case. It is clear the defendant did not intend to enlarge his liability as the indorser and surety of Bancroft. *Second.* The question of costs was entirely in the discretion of the referee. *Code,* § 306.) In this case, upon the facts found, he would have been justified in imposing costs upon the plaintiffs.

II. The judgment should be affirmed, with costs of this appeal, to the respondent.

*By the Court,* JOHNSON, J. The defendant was liable to contribute, so far as he was jointly bound and liable, with the plaintiffs, to pay the obligations of Bancroft, and no farther. The extent of this joint liability must be determined by the contract set forth in the complaint. Independent of that contract the plaintiffs have no claim whatever against the defendant. They were first indorsers on all the paper in question, and the defendant second indorser, only, on any of it, and only upon a small portion, was he even such indorser. The plaintiffs were indorsers in their firm, or partnership name of "Bickford & Huffman." Standing in this situation they entered into the contract in question, with Bancroft, the plaintiffs, in their firm name, and the defendant invididually, by which they, in consideration of certain property assigned and transferred to them by Bancroft, jointly agreed " to pay and assume all drafts by us indorsed for the accommodation of said Bancroft, drawn by him on Stebbins, Gray & Co., amounting to $4500, and other bank paper indorsed by us $936.00." The agreement then provides that in case more shall be realized, out of the property so assigned, " than enough to pay our said

Bickford *v.* Biddlecum.

liabilities over said sum of $3693.00 and all costs, expenses and legal charges, we agree to pay over to said Bancroft or his assigns all such surplus or excess after payment of our said liabilities and all costs, expenses and legal charges over the said sum of $3693.00 as aforesaid." It is thus seen that by this agreement, they only bound themselves to pay and assume all drafts, and other bank paper, *indorsed by them.* That is indorsed by the plaintiffs' firm and by the defendant, and to pay back to Bancroft the surplus or excess received by them out of the assigned property after payment of their "said liabilities" and the costs and expenses incident to the performance of the contract. It was an agreement between the plaintiffs as a firm, and the defendant jointly, on the one part, and Bancroft on the other. It is entirely clear, I think, that neither Bancroft nor the holders of his paper could have enforced this contract, or made the promise therein contained available, to any extent, beyond the paper which all the promissors had indorsed, and became liable upon, contingently or otherwise at the time the contract was executed and delivered.

It could not have been enforced against them as joint contractors, or joint promissors for paper indorsed by one of the contracting parties only, and on which only one of such joint contractors, or promissors was liable. Such paper does not fall within the terms, or the intention presumptively, of the contracting parties making the promise. It is not paper "indorsed by us" and on which "we are liable." It is plain enough that neither of the assignees and promissors intended or expected to incur any liability, beyond what they had already incurred, contingently, by their indorsement. To hold that the defendant by virtue of this contract became jointly liable with the plaintiffs to pay the debts of Bancroft for which he was not before in any respect liable, would be to wrest it from its plain terms and obvious meaning. The surrounding circum-

Bickford *v.* Biddlecum.

stances at the time the contract was executed do not, in my judgment, aid the plaintiffs, or favor the interpretation contended for by them. There is nothing in any of them, or in all, together, which shows, or tends to show, that the defendant meant to bind himself to any extent beyond his then existing liabilities. It is true that he supposed at the time, he was upon all the paper, as second indorser, the amount of which is put down. But this mistaken belief or supposition will not operate to enlarge the contract beyond its plain limitation in terms. He was careful enough to limit the joint promise to paper "indorsed by us." The legal effect of the joint undertaking by the plaintiffs and the defendant, upon the receipt of the assigned property, was, to change the nature and character of their obligation as accommodation indorsers of Bancroft, into that of principal debtors, with Bancroft as their surety, in respect to all the paper on which their names appeared. If the agreement had read that they would pay and assume all drafts and other bank paper indorsed by them, *or either of them,* there would be no difficulty in maintaining this action. But to interpolate this important sentence, under the guise of construction, would be, in effect, to change the contract which the parties made, and substitute another and different one, upon which their minds never met. This cannot be done, and the action cannot be maintained. The judgment must therefore be affirmed, with costs of the appeal, to be taken from the fund in the defendant's hands, if there shall be sufficient for that purpose, after paying and satisfying therefrom, the previous costs of the action, and if not, any balance which may remain after paying such previous costs, to be applied and the balance of such costs of appeal to be paid by the plaintiffs personally.

[MONROE GENRAL, December 7, 1868. *E. D. Smith, Johnson* and *J. C. Smith,* Justices.]